UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LILIYA I. MITINA | ) | |
| ℅ THE LAW OFFICE OF PAUL J. | ) | |
| CRISTALLO, LLC. | ) | |
| THE BROWNHOIST BUILDING | ) | CASE NO.: |
| 4403 ST. CLAIR AVENUE | ) | |
| CLEVELAND, OH  44103 | ) | |
| | ) | |
| PLAINTIFF | ) | |
| | ) | JUDGE: |
| -vs- | ) | |
| | ) | |
| THE CITY OF PARMA | ) | |
| 6611 RIDGE ROAD | ) | |
| PARMA, OH  44129 | ) | |
| | ) | **COMPLAINT** |
| -and- | ) | |
| | ) | |
| C.O. McNAMEE (#323) | ) | **(JURY DEMAND ENDORSED** |
| 6611 RIDGE ROAD | ) | **HEREON)** |
| PARMA, OH  44129 | ) | |

|  | ) |
| --- | --- |
| -and- | ) |
|  | ) |
| PTL. JOHN GALINAS (#572) | ) |
| 6611 RIDGE ROAD | ) |
| PARMA, OH  44129 | ) |
|  | ) |
| -and- | ) |
|  | ) |
| PTL. MACKENSEN (#515) | ) |
| 6611 RIDGE ROAD | ) |
| PARMA, OH  44129 | ) |
|  | ) |
| -and- | ) |
|  | ) |
| C.O. GARDNER (#346) | ) |
| 6611 RIDGE ROAD | ) |
| PARMA, OH  44129 | ) |
|  | ) |
| -and- | ) |
|  | ) |
| OFFICER DORN (#336) | ) |
| 6611 RIDGE ROAD | ) |
| PARMA, OH  44129 | ) |
|  | ) |
| -and- | ) |
|  | ) |
| OFFICER DESIMONE (#577) | ) |
| 6611 RIDGE ROAD | ) |
| PARMA, OH  44129 | ) |
|  | ) |
| -and- | ) |
|  | ) |
| ROMULO BETHANCOURT | ) |
| 17610 MILBURN AVENUE | ) |
| CLEVELAND, OH  44135 | ) |
|  | ) |
| -and- | ) |
|  | ) |
| JOHN DOES 1-7 | ) |
| CITY OF PARMA | ) |
| 6611 RIDGE ROAD | ) |
| PARMA, OH  44129 | ) |
|  | ) |

```
        -and-                          )
                                       )
JOHN DOE SUPERVISORS 8-9               )
CITY OF PARMA                          )
6611 RIDGE ROAD                        )
PARMA, OH  44129                       )
```

## INTRODUCTION

1.     This case is brought to address violations and injuries stemming from the

misconduct of various individuals, entities, officers, and other officials in

connection with the July 27, 2018, arrest and unlawful use of force on Plaintiff

Liliya Mitina.  Ms. Mitina, a single mother of a minor four-year-old son, was

wrongfully restrained, arrested, detained, and subjected to violent, unnecessary

and unwarranted abuse by City of Parma Police and jail personnel.  As a direct

result of the actions of the individual Defendants, as well as a direct result of the

unconstitutional customs, policies and/or practices of the City of Parma, Ms.

Mitina suffered immediate pain, anguish, mental, and emotional harm as well as a

loss of her dignity and of her rights as protected by the United States Constitution.

## JURISDICTION

2.     This action is brought pursuant to claims arising under the laws of the State of

Ohio; 28 U.S.C. §§1331, 1343 (3) and (4); 42 U.S.C. §1985; 22 U.S.C. §2201;

and the First, Fourth, Eighth and Fourteenth Amendments to the United States

Constitution.  This matter is also brought pursuant to 28 U.S.C. §§1983 and 1988

as it is also an action for compensatory damages, punitive damages, and attorney fees.  Venue is proper in Cuyahoga County.

3.   This Court has personal jurisdiction over the Defendants, who reside in and/or conduct business in Cuyahoga County.

## PARTIES

4.   Plaintiff Liliya Mitina is a U.S. citizen and a resident of Cuyahoga County, Ohio.

5.   Defendant City of Parma is a municipal corporation under Article XVIII of the Ohio Constitution and a "person" subject to suit within the meaning of 42 U.S.C. §1983.  The City of Parma controls, operates, and supervises the City of Parma Police Department and the City of Parma Jail.

6.   Defendants McNamee, Galinas, Mackensen, Gardner, Dorn and Desimone are and were at all times relevant police or corrections officers employed by the City of Parma and were acting under color of law and in the course and scope and in furtherance of their employment with the City of Parma.  These Defendants are each a  "person" under 42 U.S.C. § 1983.

7.   John Doe 1, who may or may not be Defendant C.O. Gardner, is and was at all times relevant a police or corrections officer employed by the City of Parma and was acting under color of law and in the course and scope and in furtherance of her employment with the City of Parma.  John Doe 1 is a white female with brown hair worn in a ponytail, is wearing glasses, and has on blue gloves as she appears in "Booking Room Video" at approximately 00:19 seconds.  (The

Dropbox link for the "Booking Room Video" is set forth herein at paragraph 49). Defendant John Doe 1's exact name and identity is known and/or readily knowable to Defendant John Doe 1 and the City of Parma as her presence, role, audio and video evidence, and other identifying information is within the knowledge, possession and control of the City of Parma. Defendant John Doe 1 is a "person" under 42 U.S.C. § 1983.

8.     John Doe 2, who may or may not be Defendant C.O. McNamee, is and was at all times relevant a police or corrections officer employed by the City of Parma and was acting under color of law and in the course and scope and in furtherance of his employment with the City of Parma. John Doe 2 is a white male with short, brown/greyish hair, is in his 40's, and appears in "Booking Room Video" at approximately 00:33 seconds. (The Dropbox link for the "Booking Room Video" is set forth herein at paragraph 49). Defendant John Doe 2 shoves Plaintiff Ms. Mitina's handcuffed left arm and elbow towards her head at approximately 00:45. Defendant John Doe 2's face can more clearly be seen on the "Booking Room Video" at 01:05 as he gestures for a restraint chair. John Doe 2's exact name and identity is known and/or readily knowable to Defendant John Doe 2 and the City of Parma as his presence, role, audio and video evidence, and other identifying information is within the knowledge, possession and control of the City of Parma. Defendant John Doe 2 is a "person" under 42 U.S.C. § 1983.

9.     John Doe 3, who may or may not be Defendant Officer Galinas, is and was at all times relevant a police or corrections officer employed by the City of Parma and

was acting under color of law and in the course and scope and in furtherance of his employment with the City of Parma.  John Doe 3 is a white male with short, brown hair, is in his 30's, and appears in "Booking Room Video" at approximately 00:14 seconds as he escorts Ms. Mitina into the booking room. (The Dropbox link for the "Booking Room Video" is set forth herein at paragraph 49).  Defendant John Doe 3 is the Officer who initially appears in the "Booking Room Video" as he escorts her into the room by her left arm.  John Doe 3's exact name and identity is known and/or readily knowable to Defendant John Doe 3 and the City of Parma as his presence, role, audio and video evidence, and other identifying information is within the knowledge, possession and control of the City of Parma.  Defendant John Doe 3 is a "person" under 42 U.S.C. § 1983.

10.    John Doe 4 is and was at all times relevant a police or corrections officer employed by the City of Parma and was acting under color of law and in the course and scope and in furtherance of his employment with the City of Parma. John Doe 4 is a white male with short, brown hair, and is wearing wraparound sunglasses on top of his head.  John Doe 4 appears in "Booking Room Video" at approximately 00:48 seconds as he takes ahold of Ms. Mitina's right arm opposite John Doe 2/O.C. McNamee.  John Doe 4 has on what appears to be a black watch strap and the back of his black uniform has the word "POLICE" in white letters. (The Dropbox link for the "Booking Room Video" is set forth herein at paragraph 49).  John Doe 4's exact name and identity is known and/or readily knowable to Defendant John Doe 4 and the City of Parma as his presence, role, audio and

video evidence, and other identifying information is within the knowledge, possession and control of the City of Parma.  Defendant John Doe 4 is a "person" under 42 U.S.C. § 1983.

11.     John Doe 5 is and was at all times relevant a police or corrections officer employed by the City of Parma and was acting under color of law and in the course and scope and in furtherance of his employment with the City of Parma. John Doe 5 is a white male with short, buzz cut brown hair, is in his 20's or early 30's, and can be seen in "Booking Room Video" at approximately 00:50 seconds with both hands gripping the front of his utility vest and wearing wraparound sunglasses on top of his head.  He is facing Ms. Mitina.  (The Dropbox link for the "Booking Room Video" is set forth herein at paragraph 49).  Defendant Officer John Doe 5's exact name and identity is known and/or readily knowable to Defendant John Doe 5 and the City of Parma as his presence, role, audio and video evidence, and other identifying information is within the knowledge, possession and control of the City of Parma.  Defendant John Doe 5 is a "person" under 42 U.S.C. § 1983.

12.     John Doe 6, who may or may not be Defendant Dorn, is and was at all times relevant a police or corrections officer employed by the City of Parma and was acting under color of law and in the course and scope and in furtherance of his employment with the City of Parma.  John Doe 6 is a white male with short, brown hair, is in his 30's, is taller and has a stocky build as well as a beard.  John Doe 6 first appears in "Booking Room Video" at approximately 01:08 as he

7

brings a restraint chair into the booking room. (The Dropbox link for the "Booking Room Video" is set forth herein at paragraph 49). Defendant John Doe 6's exact name and identity is known and/or readily knowable to Defendant John Doe 6 and the City of Parma as his presence, role, audio and video evidence, and other identifying information is within the knowledge, possession and control of the City of Parma. Defendant John Doe 6 is a "person" under 42 U.S.C. § 1983.

13.  John Doe 7 is and was at all times relevant a police or corrections officer employed by the City of Parma and was acting under color of law and in the course and scope and in furtherance of his employment with the City of Parma. John Doe 7 is a white male with short, brown hair, is in his 30's or possibly late 20's, and first appears in "Booking Room Video" at approximately 01:13 seconds. John Doe 7 is under 6'0" tall, has a beard, and his forearms are covered in tattoos. (The Dropbox link for the "Booking Room Video" is set forth herein at paragraph 49). Defendant John Doe 7's exact name and identity is known and/or readily knowable to Defendant John Doe 7 and the City of Parma as his presence, role, audio and video evidence, and other identifying information is within the knowledge, possession and control of the City of Parma. Defendant John Doe 7 is a "person" under 42 U.S.C. § 1983.

14.  John Doe Supervisors 8-9 are and were at all times relevant police or corrections supervisors employed by the City of Parma and were acting under color of law and in the course and scope and in furtherance of his employment with the City of Parma. John Doe Supervisors 8-9 are "persons" under 42 U.S.C. § 1983.

8

15. Defendant Romulo Bethancourt  is a U.S. citizen and a resident of Cuyahoga County, Ohio.

## FACTS

16. Liliya Mitina is the mother of a minor son, "A.M.," who at the time of this incident was four (4) years old.

17. Defendant Romulo Bethancourt (hereinafter, "Bethancourt") is A.M.'s father.

18. On May 28, 2015, Defendant Bethancourt was indicted in the Cuyahoga County Court of Common Pleas for the following charges:  Kidnapping, Domestic Violence, Endangering Children, and Attempted Disruption of a Public Service. These charges were brought against Defendant Bethancourt pursuant to allegations involving Liliya and A.M.

19. Thereafter, and based on Ms. Mitina's fear for her and her son's safety, the Cuyahoga County Court ordered on December 7, 2017, that "(a)ll visitation exchanges shall be in the Police Station in Parma, Ohio."

20. Accordingly, Ms. Mitina and Defendant Bethancourt were obligated to exchange their son A.M. inside the lobby of the Parma Police Station.

21. Ms. Mitina complied with the Court's Order regarding visitation exchanges taking place at the Parma Police Department.

22. During these visitation exchanges, Defendant Bethancourt frequently used his cell phone to record the exchanges with A.M.  Defendant Bethancourt told Ms. Mitina

that he was recording her because he didn't want to be "falsely accused" of being abusive or violating the law.

23.     Upon information and belief, Defendant Bethancourt was never warned, cited, or arrested for making cell phone recordings of these visitation exchanges while in the Parma Police Station lobby.

**THE ARREST**

24.     On Friday, July 27, 2018, shortly before 5:00 p.m., Liliya Mitina and her mother, N. Mitina, drove four-year-old A.M. to the Parma Police Station for a visitation exchange.

25.     The surveillance video outside the station reflects that Ms. Mitina arrived and parked her vehicle at 16:56:38 (4:56 pm and 38 seconds)[1].

26.     The surveillance video of the parking lot outside the Parma Police Department is set forth in the following dropbox link:

https://www.dropbox.com/s/b6k9ui4b52dacvc/Cam09%2020180727165500%20245035590-1.m4v?dl=0

27.     The video illustrates N. Mitina taking a minute to say goodbye to her grandson, A.M.  Liliya Mitina also hugs goodbye and kisses her son A.M. and, as she always does, tells him to be a good boy.  It is never easy for Liliya to hand A.M. over for visitation as Liliya and her family have a loving and healthy relationship with A.M.

---

[1] The "Parking Lot Video" can be viewed via the Dropbox link included herein at paragraph 26. Note that the times for the parking lot video are reflected here in military time which is consistent with the video's original time-stamp.

28. By 16:58:36, Liliya has walked several feet away from N. Mitina's vehicle.  The video shows Liliya pausing and turning so that A.M. can wave and say goodbye to his grandmother N., who waves and says a final goodbye to A.M.

29. Liliya can thereafter be seen carrying A.M. toward the police station lobby.  Lilya goes off screen at 16:58:58.

30. Less than one minute later, at 16:59:41, Liliya Mitina can be seen calmly walking back to her mother's vehicle.

31. The exchange with Mr. Bethancourt had occurred without any incident.  Literally, Liliya handed her son to Mr. Bethancourt, turned around, and walked out of the Parma Police Station.   No physical contact between Liliya and Bethancourt occurred, no threats were made, no foul language or disparaging remarks were uttered.   Liliya walked into the Parma Police Station lobby, handed A.M. to Bethancourt, and walked out.  The visitation exchange, which totaled only a few seconds, was quick and uneventful.

32. Defendant Parma Police Officer Galinas, however, was convinced that Liliya had just committed an egregious criminal offense.

33. At  16:59:46,  Officer  Mackensen  or  Desimone  can  be  seen  entering  the surveillance camera view from the adjoining parking lot.  This Officer is focused on Liliya who is simply walking back to her vehicle.

34. At 16:59:48, another Parma Police Officer, Defendant Officer Galinas, can be seen  several  yards  away  from  the  officer  in  the  parking  lot  and  several  yards behind Liliya.

35.    At 16:59:51, a third Parma Police Officer, Mackensen or Desimone, can be seen entering the scene, again from the station parking lot.

36.    Liliya Mitina was scared and had no idea what was wrong.  She jogged a few feet over to her mother's car but did not get in.

37.    At approximately 16:59:56 Defendant Officer Galinas told Ms. Mitina to stop, and she complied.

38.    Ms. Mitina also saw the three Parma Police coming for her.  Defendant Officer Galinas told Liliya that "You aren't allowed to [video] record your [child visitation] exchanges," or words to that effect.

39.    The video shows Ms. Mitina standing calmly next to Defendant Galinas.  Ms. Mitina tells Defendant Galinas that she understands and will not record visitation exchanges.

40.    Ms. Mitina adds that her son's father, Mr. Bethancourt, who is almost 6'0 tall and 245lbs., had previously been violent with her and her son.  Ms. Mitina also tells Officer Galinas that "Your friend (Mr. Bethancourt) records these exchanges all the time!"  The video even shows Ms. Mitina pointing towards the Police Station. In response to Ms. Mitina pointing out that Officer Galinas' friend Mr. Bethancourt video records visitation exchanges all the time, Officer Galinas became personally offended at the implication of favoritism and was immediately enraged.

41.    Ms. Mitina then turns away from Defendant Galinas and begins to walk towards the passenger door of her mother's car so she can leave the Parma Police Station.

42.   Officer Galinas immediately chases after Ms. Mitina, calls her a name and says something disparaging about her.

43.   Ms. Mitina is trying to understand what is happening and backs away from Defendant Galinas.

44.   Defendants Galinas and Mackensen grab Ms. Mitina and violently force her to the ground.  The Officers, now including Mackensen and/or Desimone, grab and violently twist Ms. Mitina's arm and wrist.  She was also manhandled such that she sustained injury to her neck, shoulders, wrists, neck, and back.

45.   Once on the ground, Ms. Mitina is patted down and handcuffed.  The officers assure themselves that Ms. Mitina is not armed by patting her down and making sure her hands are empty.

46.   N. Mitina observes the entire event.  At 17:00:13 N. Mitina can be seen exiting her vehicle and directly observing the Defendant Parma Officers using excessive force on Liliya Mitina.

47.   At approximately 17:00:51, Ms. Mitina is lifted up off the ground by Defendants Galinas and Mackensen and is walked back into the Parma Police Department.

48.   It is undisputed that at the time of her arrest, Liliya Mitina was unarmed.  Ms. Mitina was not under the influence of any drugs or alcohol.  Ms. Mitina was not wanted for any crimes or the subject of any capias.  Ms. Mitina's history included only traffic/vehicle related citations with zero (0) felonies, zero (0) crimes of dishonesty, and zero (0) history of violence.  She had never been accused of, let alone convicted of, anything more than misdemeanor traffic violations.

49.    At the time of her arrest Liliya was wearing form fitting jeans, a loose short-sleeved summer top, and sandals/flip-flops.

## THE BOOKING ROOM

50.    The surveillance video of the booking room ("Booking Room Video") inside the Parma Police Department is set forth in the following dropbox link[2]:

https://www.dropbox.com/s/3cccteivjwclblv/ch02_20180727170149.mp4?dl=0

51.    Fourteen seconds (00:14) into the booking video Defendant Galinas[3] can be seen escorting a compliant Liliya Mitina to face a wall so that she can be further processed.  Defendant Galinas has a hold of Ms. Mitina's left arm.

52.    C.O. Gardner enters the scene and takes a hold of Liliya's right arm.[4]

53.    Lilyia is not resisting, struggling, being loud, obnoxious, or in any other way being difficult.  By 00:38 two other white, male Parma Officers, C.O. McNamee[5] and John Doe 5, have entered the room.  Liliya is clearly handcuffed with both hands behind her back.

---

[2] Note that the "Booking Room Video" times as discussed in this Complaint are not expressed in military time or regular time, but rather, with the timing of the video as it plays starting with 00:00 and ending with 07:15.

[3] John Doe 3 is believed to be Defendant Officer Galinas and may be interchangeably identified relative to the "Booking Room Video" as well as the actions and omissions that occur within the Parma Police Department.

[4] John Doe 1 is believed to be Defendant C.O. Gardner and may be interchangeably identified relative to the "Booking Room Video" as well as the actions and omissions that occur within the Parma Police Department.

[5] John Doe 2 is believed to be Defendant C.O. McNamee and may be interchangeably identified relative to the "Booking Room Video" as well as the actions and omissions that occur within the Parma Police Department.

54.     At 00:39, C.O. Gardner, without warning, grabs Liliya's left breast.  Liliya is understandably startled by this intimate physical touching, and you can see her turn her upper torso in a surprised manner.

55.     Liliya is immediately slammed up against the wall by both C.O. Gardner and C.O. McNamee.  They exert their full weight and strength to pin her up against the wall causing immediate pain and harm to Ms. Mitina.

56.     At 00:45, Parma C.O. McNamee forcibly shoves Liliya Mitina's right elbow in an upward motion towards the top of her head causing her immediate pain and injury.  C.O. Gardner steps away but only so that another white male officer, John Doe 4, can take part in the unlawful restraint and abuse of Liliya Mitina.

57.     At 00:50, Liliya Mitina is shown to be forcibly smashed even further into the concrete wall by these two male Parma Officers, McNamee and John Doe 4.  Ms. Mitina is 5'5" and 145 lbs.  She is handcuffed, not resisting, and not attempting to flee.  She merely flinched when C.O. Gardner grabbed her left breast without warning.

58.     Three other Parma officers all stand around as if nothing abnormal is happening.  Their demeanor is casual, if not willfully disinterested.  Each of these Parma Officers, including Galinas, had the opportunity and legal duty to intervene on behalf of Ms. Mitina but none of them did.

59.    At one minute and five seconds into the video, 01:05, C.O. Gardner re-enters the room with another Parma Officer Dorn[6], and a restraint chair.  C.O. McNamee can be seen directing the restraint chair over to Ms. Mitina.

60.    At 01:12, McNamee John Doe 4 loosen their grip on Ms. Mitina although she clearly remains restrained.  Notably, Ms. Mitina is not resisting or being uncooperative in any way.

61.    By 01:34, the time at which C.O. Gardner begins adjusting Ms. Mitina's handcuffs so that her hands and legs can be restrained in the restraint chair, there are seven (7) Parma officers in the room for the continued restraint and arrest of Ms. Mitina.

62.    At 02:04 Ms. Mitina calmly and cooperatively walks backwards to be placed in the restraint chair.  She is, and has been, compliant and respectful the entire time.

63.    When the five (5) Parma Officers begin taking off Ms. Mitina's shoes and strapping her into the restraint chair, at approximately 02:17, it is worth recognizing how Ms. Mitina, a mother who has been chased, tackled, handcuffed, manhandled, and injured responds to the Parma Officers restraining her.  She isn't swearing or yelling at the Police.  She doesn't try to kick them or spit on them.  Rather, Ms. Mitina is in a complete state of shock relative to what is taking place and is wholly cooperative despite the fact that just moments earlier she was walking with her son and saying their goodbyes with grandma in the parking lot.  Ms. Mitina is the complete opposite of a verbally abusive, angry, non-compliant

---

[6] John Doe 6 is believed to be Defendant C.O. Dorn and may be interchangeably identified relative to the "Booking Room Video" as well as the actions and omissions that occur within the Parma Police Department.

16

arrestee.  Indeed, she shows an incredible amount of restraint in the face of an absurd and abusive arrest as continued physical abuse and humiliation.

64.  At 02:27, McNamee and Dorn violently shove Ms. Mitina's head down and forward by her neck and left shoulder.  She remains handcuffed and her hands are restrained behind her back.  She was told to lean forward but her hands were being held behind her back.  She was given less than three (3) seconds to comply before being, again, physically abused and harmed.

65.  It is truly disturbing to watch McNamee grabs the back of Ms. Mitina's neck and forcibly shove her head down.  Ms. Mitina was in disbelief that she was being subjected to such abuse and degradation.

66.  This incredibly violent footage shows a mom having her head shoved down to her knees by at least two Officers while her legs are restrained, and three other Parma Officers are restraining her arms and wrists.  The other Officers present do nothing in the face of what can only be described as unabashed police brutality and excessive force.

67.  For the next several seconds, McNamee and Dorn push down on Ms. Mitina's neck and upper back while she is essentially pulled in the opposite direction by the other officers.  The Officers located at the back of the restraint chair, near Ms. Mitina's hands, are pulling up and down on her hands and arms causing her pain and discomfort.  It is worth noting that also during this time, Ms. Mitina's hands are open, and she has nothing in them.

68.　　At 02:58, the Parma Officers place Ms. Mitina's wrists and hands through the arm restraints.  She is compliant.  There is absolutely no argument that Ms. Mitina is "fighting" the officers putting her hands through the restraints.

69.　　It is critically important to note that at exactly 2:58 to 02:59, you can see McNamee perform a quick sweep of Ms. Mitina's left hand.  McNamee quickly but clearly performs a sweep of Ms. Mitina's left hand with his left hand at 02:58 and a quicker sweep with his right hand at 02:59.

70.　　Ms. Mitina clearly has nothing in her left hand and C.O. McNamee has assured himself of that.

71.　　C.O. McNamee, just two seconds after checking Ms. Mitina's left hand, yells at her "Open your fucking hand or I'm going to break your fingers!"

72.　　Ms. Mitina does not know what C.O. McNamee is doing.  He already checked her left hand with *both* of his hands.  McNamee is now perversely focused on nothing more than violently exercising his dominion over Ms. Mitina.

73.　　At 03:04, the video indicates that C.O. McNamee has opened Ms. Mitina's hands by pulling her fingers away from her palm.  Nothing drops out.  That is to say, she is not and has not been concealing any weapons or contraband.

74.　　At exactly 03:08, C.O. McNamee reaches into his left pocket and pulls out a sharp metal pen/nail/compliance device.

75.　　Remarkably, the other Parma Officers do *nothing* to intervene on Ms. Mitina's behalf.  Rather, they all look on with rapt attention.

76.    At 03:09, C.O. McNamee begins pressing this sharp metal object into the center of the tendon side (not the fleshy palm side) of Ms. Mitina's left hand.  The video shows Parma John Doe Officer 2 using his body weight to drive the sharp metal object past the tendons and cartilage and into Ms. Mitina's hand.  C.O. McNamee was successful in his quest to degrade, hurt, and permanently scar Ms. Mitina.

77.     Ms. Mitina has a scar on the back of her hand to serve as a daily reminder of the torture and abuse that she suffered at the hands of the City of Parma.

78.    Liliya is in a complete state of shock and pain.  C.O. McNamee puts his metal pen/nail in his upper chest pocket at 03:27.

79.    Liliya is wheeled off camera at 03:44, having been thoroughly brutalized and humiliated.

### THE PROSECUTION OF LILIYA MITINA

80.    Liliya Mitina was charged with Contempt of Court (for allegedly recording the less than one-minute drop-off of her son to his father in the Parma Police lobby), Resisting Arrest, and Obstruction of Official Business.

81.    The problems with Ms. Mitina's prosecution, however, are many.

82.    First, Officer Galinas later signs a report wherein he attests to the fact that he merely wanted to tell Ms. Mitina that she should not record any video in the Parma Police station lobby, per a Parma Municipal Court Order.  But as seen in the parking lot surveillance video, Ms. Mitina does, in fact, stop and listen to Officer Galinas as he tells her that she is not permitted to record video in the lobby.  Officer Galinas doesn't decide to arrest Ms. Mitina because she didn't stop

to listen to his commands, which she clearly did.  Defendant Galinas arrests Ms. Mitina because of his friendly relationship with Mr. Bethancourt and because Ms. Mitina abruptly turned from him after acknowledging that recording video in the Parma Police Department lobby was prohibited.  Essentially, Officer Galinas felt disrespected and he didn't like being called out for the fact or implication that he was allowing Mr. Bethancourt to get away with video recording the exchanges while Ms. Mitina was not.

83.  Second, Officer Galinas' signed statement also attests that he "could see that Mitina was recording the exchange on her cellular phone."  The only evidence of Ms. Mitina recording the child exchange would be Ms. Mitina's phone, which the police never sought to recover during the months of her prosecution, and the Parma Police Department Lobby video.  The Parma Police Department Lobby video, according to the Parma Police, doesn't exist.  That is to say, the only two pieces of evidence which could support Officer Galinas' allegation that Ms. Mitina was videorecording in the Parma Police Department lobby were intentionally never preserved by the police.

84.  Lastly, the underlying basis for Ms. Mitina's arrest was that she violated a Municipal Court Order prohibiting video recording in the Parma Police Department "without prior consent."  The "Rule of Court," attached hereto as Exhibit "A," is unconstitutional on its face as it constitutes a prior restraint violation of the First Amendment.  The Rule of Court was implemented by three Parma Municipal Court Judges, Administrative and Presiding Judge Timothy P.

Gilligan, Judge Deanna O'Donnell, and Judge Kenneth R. Spangel.  The judicial branch can issue orders regarding the administration of justice within their own courts and such orders can include reasonable restrictions relative to the use of recording devices.  However, the Parma Police Department lobby is not part of the judicial branch of government; it is the executive branch.  Therefore, the Parma Municipal Court "Rule of Court" which formed the basis for stopping and arresting Ms. Mitina in the first place was not and is not a valid exercise of power.

85.  The Parma Municipal Court and the Parma Municipal Prosecutor, Mr. Thomas Conway, were repeatedly put on notice of the unconstitutional nature of Ms. Mitina's prosecution.  A Motion to Dismiss the charges based on the unconstitutional Court Order was filed on October 30, 2018, but the Court never ruled upon this Motion despite the fact that it was never opposed.  Another Motion to Dismiss the charges against Ms. Mitina based on the unconstitutional Court Order was filed on February 5, 2019.  Again, the Court never ruled upon this Motion despite the fact that it was never opposed.  Indeed, a Motion to Change Venue was also filed on February 5, 2019.  This Motion argued that the same Court who created the "Court Order" prohibiting video recording should not be ruling on the Constitutionality of the Order, nor should that Court be overseeing Ms. Mitina's prosecution.  The Motion to Change Venue was also never opposed and never granted.  Finally, on April 2, 2019, a third or supplemental Motion to Dismiss was filed, which again reiterated the unlawful

and improper nature of the prosecution against Ms. Mitina.  This Motion was also never opposed yet was never granted.

86.   Rather than rule on any of these challenges to the basis of Ms. Mitina's arrest, or the Motion challenging the Court's role in both deciding the Constitutionality of its own Order and whether or not Ms. Mitina violated it, the prosecution proceeded unabated.

87.   The above facts demonstrate that the City of Parma abused Ms. Liliya Mitina repeatedly.  It is inconceivable that Ms. Mitina's peaceful handoff of her son to her son's father, which: a.) only took a matter of seconds, b.) took place in the Parma Police Department, and c.) was with a father previously accused of kidnapping, domestic violence, and endangering children, could result in her arrest, permanent injury, and months of criminal prosecution.

88.   As a direct and proximate result of the Defendants' misdeeds, Ms. Mitina suffered physical pain, permanent injury, suffering, emotional distress, mental anguish, economic and other non-economic losses.

## FIRST CAUSE OF ACTION
## EXCESSIVE FORCE

89.    Paragraphs 1 through 88 are incorporated by reference herein as if fully rewritten.

90.   The actions of the Parma Defendants Galinas, Mackensen, McNamee, Desimone, Gardner, Dorn, and John Does 1 - 7 constitute an excessive use of force without legal justification.   The arresting Officers, Galinas, Mackensen and Desimone utilized excessive force during the course of their arrest of Ms. Mitina outside the Parma Police Station.   McNamee, Gardner, Dorn and John Does 1-7 utilized

excessive force against Ms. Mitina in the manner in which they manhandled her while she was handcuffed and otherwise restrained.  The actions were unreasonable, deliberately indifferent, reckless, willful, wanton and shocking to the conscience, all of which deprived Ms. Mitina of her civil rights, as secured by the Fourth and Fourteenth Amendments to the United States Constitution and through 42 U.S. C. §1983.  Further, the actions were performed under color of law and deprived Ms. Mitina of federally protected rights, in violation of 42 U.S.C. § 1983.

91.     As a direct and proximate result of the wrongful conduct of Defendants as set forth herein, Plaintiff Ms. Mitina suffered serious physical injuries, mental anguish, emotional distress and other damages.

## SECOND CAUSE OF ACTION
## FALSE ARREST

92.     Paragraphs 1 through 91 are incorporated by reference herein as if fully rewritten.

93.     Parma Officers Galinas, Mackensen, and Desimone attempted to confine and did confine Ms. Mitina without consent or privilege.  These Defendants arrested Ms. Mitina without probable cause or a reasonable suspicion that Ms. Mitina had engaged in conduct that would subject her to an arrest and/or detention.  Ms. Mitina was thereafter subject to an unlawful search on confinement by Parma Defendants McNamee, Gardner, Dorn, and John Does 1 - 7.

94.     Ms. Mitina's arrest, search, and detention were in violation of her rights as secured by the Fourth and Fourteenth Amendments to the United States Constitution.

95.  As a direct and proximate result of Ms. Mitina's unlawful arrest, search, and detention, she suffered a violation of her rights, damages, and other losses.

## THIRD CAUSE OF ACTION
## MALICIOUS PROSECUTION

96.  Paragraphs 1 through 95 are incorporated by reference herein as if fully rewritten.

97.  Parma Officers Galinas, Mackensen, and Desimone and the City of Parma by and through the City of Parma Prosecutors, prosecuted Ms. Mitina without probable cause and with malice even after being presented with legal authority setting forth that the Court Order which precipitated Ms. Mitina's arrest was in violation of the United States Constitution and was therefore unlawful.

98.  Ms. Mitina's prosecution was therefore a violation of her rights as secured by the Fourth Amendment to the United States Constitution.

99.  As a direct and proximate result of Ms. Mitina's unlawful prosecution, she suffered a violation of her rights, damages, and other losses.

## FOURTH CAUSE OF ACTION
## *Monell*: 42 U.S.C. §1983

100.  Paragraphs 1 through 99 are incorporated by reference herein as if fully rewritten.

101.  Defendant City of Parma's policies, practices, customs, and usages regarding arrests, subject control, use of force, and the documentation of uses of force were and are a moving force behind the excessive force used on Ms. Mitina by Defendants Galinas, Mackensen, Desimone, McNamee, Gardner, Dorn, and John Does 1-7.

102.    Defendant City of Parma customarily allows officers to engage in the use of excessive force without being held accountable or disciplined for their misconduct.

103.    Defendant City of Parma failed to institute adequate municipal policies, procedures, customs, usages, practices, and protocols regarding use of force discipline.

104.    Defendant City of Parma failed to institute and train Supervisors and officers to hold each other accountable when excessive force is utilized in the field.

105.    Defendant City of Parma failed to institute adequate municipal policies, procedures, customs usages, practices, and protocols regarding the use of force on non-violent citizens who are themselves or have been the victims of domestic violence.

106.    Defendant City of Parma failed to adequately train officers and employees in the proper use of arrestee restraint and compliance techniques.

107.    Defendant City of Parma further failed to institute adequate policies, procedures, customs, usages, practices, and protocols for officers regarding the accuracy of individual officer reports when the use of force is used by officers or observed by officers.

108.    Defendant City of Parma failed to adequately train officers how to write complete, accurate, and truthful reports.  Indeed, the use of force incident associated with Ms. Mitina's arrest was never documented - there simply is no use of force report. The multiple uses of force stemming from Ms. Mitina's experience in the Parma

jail and booking room are ignored but for an incident report from C.O McNamee which does not accurately describe the resistance or the force employed.  There is no indication that these uses of force were ever investigated.

109.  Defendant City of Parma has not disciplined any of the individual Defendants for the misconduct by officers described in this Complaint despite a duty to do so.

110.  An investigation into the events involving the arrest and use of force on Ms. Mitina, if any, was so incomplete and inadequate as to constitute a ratification by the City of Parma of Defendants' conduct.

111.  The training and supervision provided by Defendant City of Parma to the Defendants Officers identified herein was deliberately indifferent to the rights, safety, and health of the citizens, including citizens such as Ms. Mitina.

112.  The conduct of the City of Parma identified above constitutes a pattern and practice and again amounts to a moving force behind the constitutional violations and injuries inflicted upon Liliya Mitina.

113.  This way of doing things is so permanent and well settled in the Parma Police Department that it constitutes a custom. There have been repeated complaints and notice to Defendant City of Parma of constitutional violations by Parma Police Officers.

114.   This pattern and practice is illustrated by the following cases filed in federal court alone between 2000 and 2020 in which persons have brought excessive force claims against the City of Parma and its law enforcement officers.

a. *Damra et al. v. Cornachio et al.*, 1:00-cv-02009-LW: Parma Police Officers pulled Plaintiffs over in a traffic stop. Parma Police Officers

approached the car with their guns drawn. As is the custom in the Parma Police Department, the officers, without any communication with Plaintiffs, pulled both Plaintiffs from the car, threw them on the ground, and kicked, punched, and stomped them.

b. *McGrath v. Farinacci et al.*, 1:06-cv-00578-DAP: Parma Police Officers arrived at Plaintiff's home to serve a misdemeanor traffic warrant upon Plaintiff's brother. Nine patrol cars arrived to execute the misdemeanor traffic warrant. Officers began to tow Plaintiff's car for not having a front license plate. Plaintiff came to the front to show them his ID and proof of insurance. An officer tried to force his way in, and Plaintiff lawfully retreated into his home. As is the custom in the Parma Police Department, the officers became angry and decided to force their way into Plaintiff's home. Plaintiff put his hands in the air to surrender. However, as is the custom in the Parma Police Department, the officers still decided to use excessive force and threw Plaintiff to the ground and beat him severely. Plaintiff suffered a broken nose, a concussion, facial swelling, bleeding, bruising.

c. *Franz et al. v. City of Parma et al.*, 1:08-cv-00177-JG: Parma Police Officers initiated a traffic stop of Plaintiffs for a turn signal failure. As is the custom in the Parma Police Department, when Plaintiff requested the name and badge number of the officer, the officer became angry, and she was ordered out of her car, thrown to the ground, and arrested. As the passenger screamed for help while witnessing this happening to her friend, she was also arrested.

d. *Rababy v. City of Parma et al.*, 1:08-cv-02422-DAP: Plaintiff, a 72 year old man, was meeting with his daughter-in-law to pick up his 2 year old granddaughter. The two argued, and Parma Police Officers arrived. As is the custom of the Parma Police Department, officers, without communicating with Plaintiff, arrested him. As is the custom of the Parma Police Department, the officers used excessive force. Plaintiff was subdued and handcuffed. The officers threw Plaintiff to the floor and then pushed him face first through two sets of doors. Plaintiff suffered a broken nose, broken ribs, a concussion, and bruised wrists.

e. *Block v. City of Parma et al.*, 1:11-cv-00001-LW: Plaintiff, a 13 year old girl, stopped on the way home from school to watch a fight involving

other kids. As is the custom of the Parma Police Department, officers without communicating with Plaintiff. As is the custom of the Parma Police Department, officers then used excessive force and lifted Plaintiff up off the ground, slammed her to the ground, then sat on her back with great force. Plaintiff was then arrested. Parma Police Officers then force Plaintiff to hit her head on the police car and forced her into the squad car causing further injury.

f. *Zaccardelli v. Schuld et al.*, 1:13-cv-02423-SO: Plaintiff was pulled over after shortly fleeing the police. When Plaintiff stopped his vehicle, he surrendered by placing his hands up in plain sight. As is the custom of the Parma Police Department, the officers were angry and violently yanked Plaintiff out of his car, threw Plaintiff to the ground, and caused him to violently strike his head against the nearby squad car. As is the custom of the Parma Police Department, the officers then kicked and punched Plaintiff. Plaintiff suffered a skull fracture, multiple facial fractures, bilateral rib fractures, and lacerations to the face and head. Fortunately for Plaintiff, there was video of this illegal excessive force.

g. *Faiken v. City of Parma, et al.*, 1:04-cv-00293-JMM: Plaintiff was a security employee of a bowling alley. After he escorted one patron out of the bowling alley, he was re-entering the bowling alley to tend to a disturbance inside. As is the custom of the Parma Police Department, officers, without communicating with Plaintiff, violently tackled and threw Plaintiff to the ground. As is the custom of the Parma Police Department, officers then beat, kicked, and punched Plaintiff.

h. *Purnell et al. v. City of Parma, et al.*, 1:03-cv-02595-LW: Plaintiff was walking his dogs by the Parma Police Department. Both dogs were properly leashed and restrained. As is the custom of the Parma Police Department, officers, without communicating with Plaintiff, accosted Plaintiff, confiscated his dogs, used excessive force, and then arrested Plaintiff.

i. *Pettry v. City of Parma, et al.*, 1:13-CV-01667-LW: Plaintiff suffered a seizure in his home after work on the night of August 1, 2013. Plaintiff's family called 911, and first EMS arrived and the officers arrived. As is the custom of the Parma Police Department, officers, without communicating with Plaintiff (who was in a seizure or postictal state) or his family. As is the custom of the Parma Police Department, officers used excessive force

against Plaintiff. As is the custom of the Parma Police Department, the officers were angry and used excessive force on Plaintiff including but not limited to tasering Plaintiff multiple times. Plaintiff, still in a seizure or postictal state, was arrested.

j. *Slupski v. Dobeck et al., 1:08-cv-00813-SO*: Police arrived at the home of Plaintiff for a 911 hang up. Plaintiff and his mother both told the officer that no one in the house called 911. The officer began yelling and demanding Plaintiff's ID. The officer snatched Plaintiff's ID, and as is the custom in Parma Police Department, used force out of anger and irritation. This prompted Plaintiff to ask the officer what was wrong with him. As is the custom with Parma Police Officers, the officer became angry and told the Plaintiff that he was under arrest.

k. *Bartkiewicz v. City of Parma et al.*, 1:16-cv-00995-DAP: Plaintiff, a man well known to the Parma Police for having mental health issues, complied after a brief moment of an outburst and was suddenly and violently grabbed by the arm and thrown to the ground.  Other Parma Officers joined in on tackling and physically abusing him.  Similar to the incident involving Ms. Mitina, there was no use of force report, a common policy, practice and custom of the City of Parma.

115.    The above cases, like Plaintiff Mitina's case, demonstrate that the custom and policy of the Parma Police Department is to overreact, become angry then use excessive force and arrest people who often have not committed a crime.

116.    The unreasonable force used is extremely similar in almost all of the cases. Officers become impatient and angry with an individual, violently slam the person to the ground then they or others proceed to assault the suspect while they are restrained and/or subdued.

117.    This behavior is so permanent and well settled that it constitutes a custom and policy of the City of Parma and the Parma Police Department.

118.   This policy is the moving force behind the injuries suffered by Plaintiff Mitina.

119.   This long string of excessive force cases against the City of Parma and its police and/or corrections officers demonstrates a pattern and practice by the City of Parma of failing to adequately train, adequately supervise, as well as failing to investigate and discipline, its police and/or corrections officers when it comes to the excessive use of force.

120.   As a direct and proximate result of the conduct of each Defendant, Ms. Liliya Mitina suffered permanent physical injury, pain, emotional distress, mental anguish, and other non-economic and economic damages and losses.

**FIFTH CAUSE OF ACTION**
**CIVIL CONSPIRACY 42 U.S.C. §1983**

121.   Paragraphs 1 through 120 are incorporated by reference herein as if fully rewritten.

122.   Defendants Romolou Bethancourt, Galinas, McNamee, Gardner, Desimone, Mackensen, Desimone, and John Does 1-7 acted in concert, with a plan, and with a conspiratorial objective, to injure Ms. Mitina and to unlawfully deprive her of her rights.

123.   Specifically, on December 22, 2014, Ms. Mitina's mother, N. Mitina, called the police to report that Defendant Romolou Bethancourt was threatening Liliya Mitina with physical harm.  Upon arrival, Liliya Mitina told the police that while she was trying to leave her home, Defendant Bethancourt grabbed her hair and her baby's leg in an attempt to prevent her from leaving.  Defendant Bethancourt was

charged with kidnapping, domestic violence, endangering children, and attempted disrupting a public service.

124. Defendant Romolou Bethancourt was arrested for this incident on May 11, 2015.

125. During the course of his criminal prosecution, Defendant Bethancourt repeatedly threatened that he was going to exact revenge against Ms. Mitina for her role in having him arrested.

126. Defendant Bethancourt also made Ms. Mitina aware of his personal friendship with Parma Police Officer Defendant Galinas.  Defendant Bethancourt told Ms. Mitina that he performed work on Defendant Galinas' car and the cars of other Parma Police Officers and employees.

127. When Ms. Mitina walked into the Parma Police Station lobby on July 27, 2018, she was carrying her 4 year old son and her cell phone.  She walked into the Parma Police Station, handed her child to Defendant Bethancourt, and without saying a word, turned around and walked back out.  This visitation exchange took merely seconds.

128. Yet the parking lot surveillance video from the Parma Police Department shows Ms. Mitina being chased, literally chased, by Defendant Galinas in his heated attempt to "inform" Ms. Mitina that video recording is not permitted in the Parma Police Station lobby.  Further evidence of the conspiracy is the fact that two other police officers, Mackensen and Desimone, follow Officer Galinas out the door of the police station, all presumably acting as backup for the so-called "friendly advice" Officer Galinas was going to give Ms. Mitina.

129.   Further evidence of the conspiracy is the fact that the parking lot surveillance video shows Officer Galinas having a talk with Ms. Mitina wherein he tells her that video recording is not permitted, and she indicates she understands.  But this was not enough for Officer Galinas because the point of being ready for Ms. Mitina's visitation handoff wasn't to warn her about recording in the lobby, it was to arrest and abuse Ms. Mitina.  Ms. Mitina was grabbed and dragged to the ground so Officers Galinas, Mackensen, and Desimone could physically abuse her, handcuff her, and take her into custody.

130.   The evidence of a conspiracy to harm Ms. Mitina continues once she is in the Parma Police Station booking area.

131.   The booking room video shows Ms. Mitina calmly walking into the booking room with Officer Galinas escorting her with his hand on her left upper arm.  She is being compliant and quiet.  She stands there, still and calm, as she is being processed.  It is only when C.O. Gardner unexpectedly grabs her left breast that the startled Ms. Mitina turns her upper torso.  Defendant McNamee, the C.O. who drove his metal pen or other object into Ms. Mitina's left hand, authored an incident report wherein he describes Ms. Mitina's startled response to Gardner's breast grabbing as Ms. Mitina "very aggressively pulling away from her [C.O. Gardner] and disobeying her [C.O. Gardner] commands."  C.O. McNamee proves himself here to be not only sadistic but also a liar.  This inaccurate description of Ms. Mitina's response was also part of a cover-up relative to the abuse these Defendants inflicted upon Ms. Mitina.

132.    As indicated, the evidence of a conspiracy is also evident when considering that the video shows C.O. McNamee performed a hand-sweep of Ms. Mitina's left hand with the fingers of his left hand.  Her hand is empty.  Yet only a few seconds later C.O. McNamee begins driving his metal "compliance object" into the tendon side of Ms. Mitina's hand.   Indeed, even if the video had not captured C.O. McNamee's hand-sweep, he utilized enough force to permanently scar and injure Ms. Mitina only a few seconds after threatening Ms. Mitina by stating "[o]pen your fucking hand or I'm going to break your fingers!".  Moreover, at the time C.O. McNamee injured Ms. Mitina's hand, she was surrounded by no less than five (5) Parma Police/Corrections Officers, in the heart of the Parma Police Department, in a restraint chair with her arms and legs strapped down—*all for allegedly having her phone video recording a visitation hand off to the child's son which took a matter of seconds.*

133.    Ms. Mitina's prosecution further evidences a conspiracy. Despite the fact that her attorneys repeatedly called the prosecuting attorney's attention to the fact that the underlying arrest was unconstitutional, and that the presiding Judge needed to recuse himself from deciding the Constitutionality of his own order and Ms. Mitina's potential violation of that order, no opposition was ever put on the record and Plaintiff's Motions were inexplicably ignored.

134.    Lastly, the evidence of Ms. Mitina's alleged video recording of the visitation exchange would have been captured by the Parma Police Department lobby security video.  Not coincidentally, that video does not exist.  Rather, the evidence

the City of Parma was going to use against Ms. Mitina in support of their case that she was recording a visitation exchange was a witness—not a disinterested third party witness who was also present in the lobby, but rather Defendant Romolou Bethancourt.  As such, Ms. Mitina's arrest was, from the very beginning, a conspiracy to exact revenge, to injure her, and to violate her rights.

135.  The fact that other Parma Officers did not intervene and that they did not accurately memorialize the unnecessary and excessive use of force inflicted upon Ms. Mitina is also evidence of their intent to cover-up this unlawful plan.

136.  As a direct and proximate result of the conduct of each of these Defendants, Ms. Liliya Mitina suffered permanent physical injury, pain, emotional distress, mental anguish, and other non-economic and economic damages and losses.

## SIXTH CAUSE OF ACTION
## FAILURE TO INTERVENE

137.  Paragraphs 1 through 136 are incorporated by reference herein as if fully rewritten.

138.  Defendants Galinas, Mackensen, Desimone, McNamee, Gardner, Dorn, and John Does 1-7 had the opportunity as well as the legal duty to intervene on behalf of Ms. Liliya Mitina so as to prevent her rights from being violated, or to curtail the violation of her rights.

139.  Each of the Defendants failed in this regard and are therefore liable.

140.  These Defendants actions and inactions were under color of law and deprived Ms. Liliya Mitina of federally protected rights.

141. These Defendants actions and inactions were willful, wanton, reckless, and/or malicious and also deprived Liliya Mitina of her rights under the State of Ohio and the Ohio Constitution.

142. As a direct and proximate result of the wrongful acts and omissions as set forth herein, these Defendants caused Liliya Mitina to suffer extreme physical pain, permanent injury, severe mental and emotional distress, and other economic and non-economic losses.

## SEVENTH CAUSE OF ACTION
## WILLFUL, WANTON, RECKLESS, MALICIOUS AND BAD FAITH CONDUCT

143. Paragraphs 1 through 142 are incorporated by reference herein as if fully rewritten.

144. As set forth herein, each of the Defendants, Galinas, Mackensen, Desimone, McNamee, Gardner, Dorn, and John Does 1-7 acted in a willful, wanton, reckless, and/or malicious manner, and/or acted in bad faith while acting in the course and scope of their employment and under color of law which culminated in the injuries, deprivations and damages set forth herein such that these Defendants are not entitled to the defenses and immunities for negligent conduct as set forth in O.R.C. §2744.01 *et seq.*

145. The Defendants conspired to arrest and abuse Ms. Mitina. Ms. Mitina was supposed to be handing her son over in a safe environment—a police station. It is only through the perverse conduct of these Defendants that she should be subject to arrest, physical injury, permanent scarring, and months of prosecution for

allegedly video recording her son's father for a handful of seconds.  Ms. Mitina experienced a large and intimidating white male drive a sharp object into her hand while her arms and legs were restrained, and not one of the Defendants even offered her any medical attention, let alone provide her with some modicum of care.

146.   The Defendants' actions and/or omissions, including but not limited to the misdeeds as set forth herein, were done in a willful, wanton, reckless, malicious and/or bad faith manner, and as a direct and proximate result of their actions and/or omissions, Liliya Mitina suffered extreme physical pain, permanent injury, severe mental and emotional distress, and other economic and non-economic losses.

### EIGHTH CAUSE OF ACTION
### ABUSE OF PROCESS

147.   Paragraphs 1 through 146 are incorporated by reference herein as if fully rewritten.

148.   Alternatively, to the extent the criminal proceedings were commenced in a proper form and with probable cause, the proceedings against Liliya Mitina were perverted in an attempt to accomplish an ulterior motive for which criminal proceedings were not designed.  Here, Defendants City of Parma and Officer Galinas, Mackensen, and Desimone perverted the criminal prosecution against Liliya Mitina so as to harm her ability to prevail in a subsequent civil rights lawsuit which would seek to address both her false arrest and her claims for

excessive force.  This ulterior motive is akin to interfering with an individual's right to pursue a civil rights claim.  More specifically, by these Defendants continuing to pursue Ms. Mitina's criminal charges with the actual knowledge that she has challenged the City's enforcement of a Court Order issued by the very Court that is prosecuting her, is a further act in the use of the criminal process not proper in the regular course of conduct of the proceedings.

149.  As a direct and proximate result of the wrongful acts and omissions as set forth herein, these Defendants caused Liliya Mitina to suffer economic and non-economic losses.

### NINTH CAUSE OF ACTION
### FIRST AMENDMENT RETALIATION

150.  Paragraphs 1 through 149 are incorporated by reference herein as if fully rewritten.

151.  Defendant Parma Police Officer Galinas explained in a post-incident report that his purpose in chasing after Ms. Mitina was simply to "[a]dvise Mitina that she could not record in the Police station."  The parking lot video of Ms. Mitina's arrest illustrates that Officer Galinas catches up with Ms. Mitina, and they have a brief conversation.  During the course of that conversation, Officer Galinas advises Ms. Mitina to not record in the Police station.  Ms. Mitina says she understands and adds that her son's father, Mr. Bethancourt, who is almost 6'0 tall and 245lbs., had previously been violent with her and her son.  Ms. Mitina also tells Officer Galinas that "Your friend (Mr. Bethancourt) records their exchanges

all the time!" The video even shows Ms. Mitina pointing towards the Police Station. In response to Ms. Mitina pointing out that Officer Galinas' friend Mr. Bethancourt video records visitation exchanges all the time, Officer Galinas became personally offended at the implication of favoritism and was immediately enraged.

152. Based on these facts, Officer Galinas had accomplished his goal of advising Ms. Mitina that she was not to record video in the Parma Police Station. Ms. Mitina acknowledged his admonition. As such, Officer Galinas' statement that "he grabbed her arm in an attempt to speak with her" is false. Officer Galinas had already spoken with Ms. Mitina. Officer Galinas' arrest was based on taking offense to Ms. Mitina's comments, which are protected speech under the First Amendment.

153. As a direct and proximate result of the wrongful acts and omissions as set forth herein, these Defendants caused Liliya Mitina to suffer extreme physical pain, permanent injury, severe mental and emotional distress, and other economic and non-economic losses

**TENTH CAUSE OF ACTION**
**NEGLIGENT HIRING, TRAINING, RETENTION, DISCIPLINE AND**
**SUPERVISION.**

154. Paragraphs 1 through 153 are incorporated by reference herein as if fully rewritten.

155. Defendant City of Parma employed Defendants (name but exclude prosecutor).

156.   Defendant City of Parma, by and through its supervisors, officers and officials, knew or should have known that Defendants Galinas, Mackensen, Desimone, McNamee, Gardner, Dorn, and John Does 1-7 had a propensity for engaging in unlawful activities such as false arrest, excessive force, abuse of process, unlawful retaliation, failing to intervene, and willful, wanton, reckless, malicious and/or bad faith behavior.

157.   Defendant City of Parma, by and through its supervisors, officers and officials, also failed to adequately train Defendants Galinas, Mackensen, Desimone, McNamee, Gardner, Dorn, and John Does 1-7 relative to arrests and false arrest, proper use of force versus excessive force, abuse of process, retaliation, the need to intervene versus failing to intervene when there is both a legal duty and an opportunity to do so, and avoiding willful, wanton, reckless, malicious and/or bad faith behavior as well as other areas of training relevant to the matter herein.

158.   Defendant City of Parma, by and through its supervisors, officers and officials, also failed to adequately discipline and/or supervise these Defendants Galinas, Mackensen, Desimone, McNamee, Gardner, Dorn, and John Does 1-7 relative to improper arrests and arrest techniques, proper use of force versus excessive force, abuse of process, retaliation, failing to intervene when there is both a legal duty and an opportunity to do so, and avoiding willful, wanton, reckless, malicious and/or bad faith behavior.

159.   Defendant City of Parma, by and through its supervisors, officers and officials, engaged in negligent and/or willful, wanton, and/or reckless conduct in hiring,

training, disciplining, retaining, and/or supervising Defendants Galinas, Mackensen, Desimone, McNamee, Gardner, Dorn, and John Does 1-7 and this conduct was the direct and proximate result of Liliya Mitina's severe pain, permanent physical injury, mental anguish, emotional distress, and other economic and non-economic losses.

**ELEVENTH CAUSE OF ACTION**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.**

160. Paragraphs 1 through 159 are incorporated by reference herein as if fully rewritten.

161. Defendants either intended to cause emotional distress of knew or should have known that their actions would result in serious emotional distress to Ms. Mitina.

162. Defendant Officer Galinas' physically abusive arrest, with assistance by Mackensen and Desimone, was extreme and outrageous.  Even more extreme and outrageous were the actions of C.O. McNamee.  Violently shoving Ms. Mitina's head down while she has her hands cuffed and is restrained behind her back, threatening to break her fingers unless she "opens [her] fucking hand" after he already swept her hand and knew it was empty, and using his bodyweight to drive a metal pen or nail/compliance device into her left-hand tendons less than ten seconds after threatening her and which ultimately caused Liliya Mitina injury and permanent scarring, are all so extreme, outrageous, beyond the realm of human decency and intolerable in a civilized society that emotional distress was guaranteed to occur.

163. The physical and emotional abuse inflicted upon Ms. Mitina by Defendants Galinas, Mackensen, Desimone, McNamee, Gardner, Dorn, and John Does 1-7 as described herein was all so extreme, outrageous, beyond the realm of human decency and intolerable in a civilized society that emotional distress was guaranteed to occur.

164. The actions of C.O. Gardner in grabbing Ms. Mitina's breast and then lying about how Ms. Mitina was violently trying to escape or get away, as well as shoving Ms. Mitina up against the wall when she naturally flinched as a result of having her breast grabbed, was also intended to or expected to cause emotional distress. C.O. Gardner's conduct in this regard was extreme and outrageous.

165. The Defendants who failed to intervene, Galinas, Mackensen, Desimone, McNamee, Gardner, Dorn, and John Does 1-7, knew or should have known that their failure to stop the abuse Ms. Mitina was enduring was also of a nature that they knew or should have known that their failures were likely to, and did, cause emotional distress as it was extreme and outrageous for other law enforcement personnel to idly sit by and watch the sadistic treatment of Ms. Mitina.

166. The Defendants responsible for strapping Ms. Mitina into a restraint chair as well as those responsible for allowing a bleeding and injured Ms. Mitina to remain strapped in a restraint chair for 3 to 4 hours was also so outrageous and extreme that it went beyond all possible bounds of human decency and is intolerable in civilized society. These Defendants knew or should have known that their conduct would cause serious emotional distress to Ms. Mitina.

167. As a direct and proximate result of these Defendants' unlawful conduct, Plaintiff has suffered and will continue to suffer mental anguish so serious and of such a nature that no reasonable person could be expected to endure it, and for which these Defendants are liable.

168. These Defendants' acts were willful, wanton, egregious, malicious, and worthy of a substantial sanction to punish and deter Defendants and others from engaging in this unlawful conduct.

## TWELFTH CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS.

169. Paragraphs 1 through 168 are incorporated by reference herein as if fully rewritten.

170. Plaintiff Liliya Mitina was subjected to physical peril at the hands of Defendants Galinas, Mackensen, Desimone, McNamee, Gardner, Dorn, and John Does 1 - 7 and suffered severe emotional distress.

171. As a direct and proximate result of these Defendants' unlawful conduct, Plaintiff Mitina has suffered and will continue to suffer serious mental anguish for which these Defendants are liable.

## THIRTEENTH CAUSE OF ACTION
## UNLAWFUL RESTRAINT, DELIBERATE INDIFFERENCE, EXCESSIVE FORCE.

172. Paragraphs 1 through 171 are incorporated by reference herein as if fully rewritten.

173. Following her abuse at the hands of the Parma Defendants in the Parma Police Station, Ms. Mitina was left strapped into a restraint chair and wheeled into a detox room meant for people who have had too much to drink and/or are so unruly that they need to put in an isolated environment.  In Ms. Mitina's case, this isolation was meant to inflict additional pain, humiliation and suffering.

174. The video does not demonstrate that Ms. Mitina was non-compliant and therefore, placing her in a restraint chair was a form of punishment and abuse.

175. To make matters worse, the Defendants, Galinas, McNamee, Gardner, Dorn, and John Does 1-7 left Ms. Mitina in the isolation room, strapped to a restraint chair, with a bleeding and injured hand and no ability to use the bathroom, for between three and four hours.

176. No medical attention was ever provided to Ms. Mitina despite an obvious need to look after her injuries, inflicted by the Defendants.  As such, these Defendants were also deliberately indifferent to Ms. Mitina's medical needs.

177. These misdeeds were a violation of Ms. Mitina's Fourth, Fourteenth and/or Eighth Amendment rights.

178. As a direct and proximate result of these Defendants' unlawful conduct, Ms. Mitina suffered pain, injury, mental anguish, emotional distress, and other economic and non-economic losses.

179. Defendants' acts were willful, egregious, malicious, wanton, and reckless and worthy of a substantial sanction to punish and deter these Defendants and others from engaging in the unlawful conduct.

## FOURTEENTH CAUSE OF ACTION
### *Other Monell Liability;* 42 U.S.C. §1983

180.   Paragraphs 1 through 179 are incorporated by reference herein as if fully rewritten.

181.   Defendant City of Parma permits, tolerates, and is deliberately indifferent to its failure to train and supervise corrections officers, police and other jail personnel on how to interact with people in custody, including how to use force appropriately in a correctional setting, how to not sadistically abuse inmates, how to restrain inmates, the proper use of a restraint chair and isolation, how to gain compliance, how to provide medical care to people in need, and the Constitutional obligation of how to intervene to prevent coworkers from using excessive force and other Constitutionally offensive actions against those in custody.

182.   Defendants Galinas, McNamee, Gardner, Dorn and John Does 1-7's did nothing while these Defendants intermittently abused Plaintiff Ms. Mitina and such conduct is consistent with a recurring pattern of how corrections Officers and other Parma personnel interact with people in Custody within the Parma jail.  The City of Parma failed to train and supervise its employees in this regard and was on notice that its failure to train and supervise its corrections officers and other personnel resulted in a pattern of constitutionally offensive acts, but the City of Parma took no remedial action.

183.   Defendants Galinas, McNamee, Gardner, Dorn and John Does 1-7's abuse of Plaintiff Mitina is consistent with a recurring pattern of how corrections officers

and other Parma personnel interact with individuals in custody at the Parma jail, due to a lack of training and accountability, and due to a general tolerance for ignoring the humanity of those in the jail.  The City of Parma failed to adequately train corrections staff on conflict resolution, de-escalation techniques, and anger management.

184.   These failures led to a violation of Ms. Mitina's Fourth, Eighth, and Fourteenth Amendment rights,   As a direct and proximate result of the City of Parma's unlawful conduct, Plaintiff Ms. Mitina suffered pain, injury, mental anguish, emotional distress and other economic and non-economic losses.

### FIFTHTEENTH CAUSE OF ACTION
### First Amendment *Monell*; 42 U.S.C. §1983

185.   Paragraphs 1 through 184 are incorporated by reference herein as if fully rewritten.

186.   Absent a valid law prohibiting video recording inside a public building, the ability to record video is protected by the First Amendment.

187.   The official policy of the City of Parma with regard to video recording in the Parma Police Station lobby is that it is prohibited by a Court Order (See, Exhibit 1, attached hereto).

188.   The Rule of Court prohibiting such video recording is an entry signed by all three Parma Municipal Court Judges and is issued from the Parma Municipal Court.

189.   Plaintiff submits that the Parma Municipal Court, as the judicial branch of Parma's government, lacks the authority to issue such orders which would cover

the Parma Police Department, part of the executive branch of Parma's government.

190.   As such, the Rule of Court at issue here is unconstitutional.  Plaintiff submits that the Parma Judges cannot create a law that covers the behavior of citizens in the Parma Police Station lobby as it is out of their jurisdiction.

191.   Parma may argue that the Rule of Court is not an actual "law" but is rather just what it purports to be, a Rule of (judicial) Superintendence for the Courts of Ohio. And further, violators of this rule will be subjected to the same sanctions which are available to a Judge so that the Judge may insure order and decorum in their court.

192.   As the Rule of Court was posted in the Parma Police Station lobby and formed the basis upon which Plaintiff Mitina was detained and ultimately arrested, Plaintiff submits that it is the official policy of the City of Parma, and that this policy directly and proximately led to a violation of Plaintiff Mitina's constitutional rights.

193.   Should Parma consider that Ms. Mitina was not detained and then arrested based on anything more than a Rule of Superintendence for the Courts of Ohio, Plaintiff Mitina submits that it is the unofficial custom, policy and practice of the City of Parma to detain and arrest individuals for exercising their First Amendment right to video record in the Parma Police Station lobby and that the Rule of Court at issue, on its face and as enforced, is an unlawful prior restraint on speech.  The Rule of Court then serves as evidence that the City of Parma has a pervasive,

long-standing practice which has the force of law.  Indeed, not only is the Rule prohibiting video recording posted in the Parma Police Station lobby, it is vigorously enforced.

194.    As a direct and proximate result of the City of Parma's unconstitutional official policy, and/or their unofficial custom, policy and practice relative to video recording in the Parma Police Station lobby, Plaintiff Mitina suffered a loss of her rights, humiliation, physical injury, pain, mental anguish, emotional distress, and other economic and non-economic losses.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Liliya Mitina prays for judgment against the Defendants, jointly and severally, and that this Honorable Court provide the following:

(A)    Award compensatory and consequential damages including, but not limited to, damages for pain and suffering, mental anguish, emotional distress, humiliation, embarrassment, and inconvenience that Ms. Mitina has suffered and is reasonably certain to suffer in the future;

(B)    Declare that the Defendants' acts, conduct, and omissions constitute violations of the First, Fourth and Fourteenth Amendments to the United States Constitution, and of 42 U.S.C. § 1983 and state law;

(C)    Enter judgment in Ms. Mitina's favor on all claims for relief;

(D)    Award punitive and exemplary damages against the individual Defendants for the individual Defendants' egregious, willful, malicious, conduct;

(E)    Award pre- and post- judgment interest at the highest lawful rate;

(F)     Award Ms. Mitina her reasonable attorneys' fees and the costs of this

action and other costs that may be associated with this action; and

(D)     Award all other relief in law or equity, including injunctive and declaratory

relief, to which Ms. Mitina is entitled and that the Court deems equitable, just and proper.

Respectfully submitted,

/s/ Paul Cristallo
PAUL CRISTALLO (0061820)
The Law Office of Paul J. Cristallo, LLC.
The Brownhoist Building
4403 St. Clair Avenue
Cleveland, Ohio 44103
T: 440.478.5262
F: 216.881.3928
Email:  Paul@cristallolaw.com

COUNSEL FOR PLAINTIFF
Liliya Mitina

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

/s/ Paul Cristallo
PAUL J. CRISTALLO
Attorney for Plaintiff Liliya Mitina